Alright, Mr. Dolmage. Good morning, my name is Howard Dolmage. I represent the plaintiffs and the appellants, Andy Carr et al, who are Continental Pilots. May it please the court, we're here from appealing a summary judgment dismissal by the trial court over in Houston. What happened procedurally, we had a very early motion for dismissal filed by the defendants, which led to some limited discovery, and that turned into a motion for summary judgment. This is a bad faith case under the Breach of Duty Affair representation that we have here, and my clients are Continental Pilots that believe that they were wronged by the seniority list integration that occurred when United and Continental merged back in 2010. I'd like to take a moment to kind of explain the framework of the unions, just to help the court out a little bit here, but we have the Air Line Pilots Association, which has a national and international organization, and then under that you have each of the individual airlines, and they have what's called an MEC, Master Executive Council. So United, in this case, had one, and Continental had one, and then from there we also have merger committees that are formed. ALPA International promulgates a lot of rules and procedures for mergers, and they've been sued a number of times over the years, as the court likely knows because some of them have been in this court, for problems with mergers. And over the years they've evolved and developed a set of policies and procedures that attempt to follow the law and on their face look neutral, and if they are actually followed, they probably do create a fairly level playing ground. What happens, though, in a lot of these airline mergers is you have a larger pilot group and a smaller pilot group, and one of the things that ALPA has experienced over the years is a larger pilot group getting upset about the way a merger and seniority list integration went, and then maybe leaving ALPA, thus losing a lot of dues revenue. In fact, there's evidence in the record where they've talked about those concerns, and in fact their merger policy is a product of their concerns about that. One of the things that also is important for the court to maybe understand about seniority for pilots is it's their lifeblood. It determines when they upgrade to captain, what equipment they fly, whether they get Christmas off, what kind of schedule that they might get to be able to fly on the weekends versus the week, things like that. So it's very, very important. What we had here was a couple of situations where ALPA, in our view, did not follow their own policies, and they set up ALPA represented both United and Continental pilots, and they were caught in the middle of the merger, and your allegation is that there was bad faith on the part of the union because they favored one airline pilots group over the other airline pilots group. That's exactly correct, Your Honor. Where is the bad faith on the part of the union? We believe they steered the result to favor the United pilots out of fear that the United pilots, if they didn't get what they considered a good seniority list integration, they would break away like the U.S. Air Pilots did back in 2008. If we looked at all of these cases, would we be likely to find the result you're complaining about, and that is that in all or most cases ALPA sided in favor of the surviving larger group? I think if you were to review the cases, you would find examples where that did occur. You will also find examples where ALPA has successfully been sued for money damages in seniority list integrations. Probably the most notable one in recent history is the TWA case that came out of New Jersey in which TWA merged with American, and American was a non-ALPA carrier. So you have ALPA national, and then you have your two MECs, United and Continental. What role does the union play in deciding the final merger? I mean there's a separate arbitration mediation group that decides it, not the union. So how did the union get involved in the decision to cause it to go against your group? That's exactly correct, and that's the whole point here. We believe that the union and ALPA national sent Betty Ginsberg, a lawyer, to a hearing that was occurring. I want to explain one real quick thing, and then I can answer your question and make it clear. They set up an arbitration panel of three arbitrators, which was agreed upon, and then they also had a separate arbitrator who was going to rule on discovery disputes. The Continental pilots wanted certain data from the United pilots because they wanted to make certain arguments that they felt were relevant to the seniority list issues, and I can get to those in a second. And ALPA sent Betty Ginsberg, a lawyer from ALPA national, their main office, to that hearing, and we believe, based on some of the e-mails that are in the evidence and everything, that it does show that she helped steer that towards the United pilots. The Continental pilots were denied the evidence they needed for their merger argument, their seniority list integration argument, and the United pilots were granted. So Javits, the special arbitrator that was doing the pre-arbitration discovery issues, ruled for United, ruled against Continental. Then there was a separate hearing a little bit later where the Continental pilots wanted certain things and ALPA didn't send any assistance for them and Continental lost that one. So we think that's one example of where ALPA national, in effect, steered it or engaged in bad faith. We have some stuff in the record about some discussions with the arbitrator and some of the things there. Witnesses that were there said the arbitrator was leaning towards them until Ms. Ginsberg showed up. She knew Mr. Javits, and we believe that was one example of bad faith. So the Continental pilots were deprived of some information they needed that they wanted to present to the arbitration panel, and that information related to wage data. The reason that was important is because when you merge airline seniority lists, you have career expectations as one of the attributes they look at. Well, United, because it had so much financial trouble, even though it was the bigger carrier, their pilot salaries had declined rapidly, whereas Continental pilots had been making more money on smaller equipment. So they wanted that wage data to show that their career expectations were actually better at the time of merger than the United pilots. And where that's also important is the way the seniority list integrations work a lot of times is they take the type of airplanes they're flying, the seats they're in, their longevity, and they have the list of factors. But career expectations is one of the important factors. Since the United pilots were making less money, even though they might be flying bigger airplanes, that was very, very relevant information and would likely lead to the panel considering that information, which it in fact did when you read their award. The other thing that's important with respect to that issue is many of the United pilots were furloughed from United and Continental had picked them up and hired them as Continental pilots. But then when the merger came along, they got to go back to United and be way senior to guys that they were junior to when they were flying at Continental, and the Continental pilots felt that was very unfair to them. They felt like the United pilots ended up a lot higher, and therefore that's their damages or their injury here. But there has to be more than just an unfavorable result that you don't like it and you think the other side came out better on the deal. I mean, you still have to show there was bad faith on the part of the union, that the union got involved and caused this unfair result. Eddie Ginsberg coming and helping with that discovery dispute on what information they would be allowed to get to present to the actual three-panel arbitrators that were deciding seniority list integration. And then the other item that we feel is an example of bad faith is against ALPA's written policies. They hired a Delta pilot named Harwood, and he helped build a model for the United pilots that was actually the model used. And there's evidence in there of Harwood sending emails saying, you know, we put the kibosh on the Continental guys. We're winning this one. And they ultimately adopted Harwood's model, which greatly favored the United pilots. Well, Lee Mote, who was the president of ALPA National, talked to Jay Pierce, who was the chairman of the Continental MEC, and he said, Harwood's just coming despite this. It's against our ALPA policies. Harwood's just coming, and he's just going to crunch numbers because he's got mad computer skills. So Pierce said, okay. Well, then when Harwood gets there, he actually gets very involved with everybody. He helps advocate a position. He has about 100 pages of testimony in the arbitration record describing his model and all that. And then post-hearing, while they're submitting the briefs, he's pumping out emails saying we, United, are winning, even though he's a Delta pilot. And by ALPA rules, he was not supposed to be there. But who hires him? Did ALPA hire him? Or the merger committee hired him? That's a disputed fact. We have evidence that there was payments both from ALPA National and maybe the merger committee. And that's in the record. We've submitted some of their LM-2 forms, also the testimony of Harwood. He did get paid by ALPA National. There's no question. Are you saying the emails or the smoking guns of bad faith? Not in and of themselves. What I'm saying is that one of the problems with bad faith is it's a subjective test. I mean, it's kind of hard. That's true. But facially, at least from what I read from the briefs, the fact that the Delta pilot was involved in and of itself didn't seem to be problematic because, as I understood it, which admittedly is not as well as you do, not atypical for someone not involved with the two airlines in question, you know, to be in a role, dah, dah, dah. I follow what you're saying in terms of well representation. He was going to crunch numbers. And you're saying, well, he did more than that. He had a thumb on the scale. And so I'm just starting from if his mere presence there as a Delta pilot, that didn't strike me in the briefs as something unusual or good in the bad faith. But here you alluded a couple times to e-mails where he's saying we're winning and that kind of thing. So that's why I'm asking, yes, it's subjective. But is that your ‑‑ if I'm otherwise skeptical about the bad faith claim you have, I'm just asking am I going to need to dig into the e-mails to get past what facially looks okay as a neutral person to figure out that he was more than that. That's all I'm asking. And the answer to your question I think is yes, hopefully you'll take a look at the e-mails or at least the cites to the e-mails where we describe them and put some things in quotes. That's in docket 54, which I think is, I'll tell you, it's in the record. Okay. It's our summary judgment motion where we cite to those things. But I want to answer your question also a little further by reminding the court that, as this court has said and many other courts have said, that because of the nature of bad faith being such a subjective thing, it's not something that's right for summary judgment. And you can have something that on its face looks facially neutral and you can have things that, well, that's really no big deal. But until you get in there and get in a trial where you can put the evidence on and you can let the jury eyeball the witnesses and get deeply into some of these issues, which we didn't get to do because we had limited discovery, you sometimes can't fully prove your bad faith case. So I would say that as this court's right. It may be true, but it's also true under Rule 56. If the judge is considering the motion in the light most favorable to the non-movement, which is you, and in doing that takes into account what you said and still is not of the view that they aren't entitled to judgment, I mean, presumably the trial judge had the same thing you're saying, but in viewing them didn't view them to be as potent as you're representing. Is that a fair way to put it? Well, I think I have great respect for Judge Rosenthal, but I think that if you read her opinion, she tends to focus more on the fact that ALPA has a policy and procedures to do these arbitrations that is fair, and they follow that policy. And I don't think she looked at some of the things, and there's some places in the opinion, particularly page 24 and later, where if you look at some of the points that she cites to, there is controverting evidence that she seems to have ignored. So now we get back to some of the specifics of the evidence, which then if you start to argue facts, you're almost at a point where summary judgment is, maybe it's not a case ripe for summary judgment. Was there any objection to Harwood's testimony? Did you bring it to the arbitrator's attention or object to Harwood's evidence or testimony? ALPA MEC Chairman Jay Pierce called ALPA National President Lee Moak when he found out what Harwood was doing and objected. He originally agreed to let Harwood show up, thinking Harwood was only going to crunch numbers and not actually be an advocate for the United Pilots. So, yes, there was an objection. What procedurally went on at the arbitration may be a little different than some of the things that were happening outside the arbitration, president to chairman, which they're sort of co-equals in the sense that he's the MEC president equivalent, if you will. I see I'm about out of time. I'm saving a little for rebuttal, so. Okay. Thank you. Thank you, sir. Good morning, Your Honors, and may it please this honorable court, with me is my colleague Marcus Migliori from the Airline Pilots Association Legal Department. The summary judgment proceedings before Judge Rosenthal were not limited. The plaintiffs had the opportunity to take every deposition that they asked for. They were given that opportunity. They took several depositions. They got a lot of documents. Judge Rosenthal wrote a very extensive opinion in which she not only dealt with the fact that the process itself was fair but that it was applied fairly. She didn't limit herself the way counsel says. One point before I wade into a number of these other points, the Fifth Circuit in O'Neill v. Alpa on remand from the United States Supreme Court granted summary judgment to Alpa in a bad faith claim, and it did so because the evidence of bad faith that has to come to the court has to be that is sufficiently egregious and so intentionally misleading as to be invidious, and it has to, in this case where you're dealing with an arbitration, seriously undermine the integrity of the process, the arbitration process, and lead to an erroneous outcome, as the Supreme Court said in the Hines case. Now, this is a heavy burden, but let's put this in context as to why in this case it's a particularly heavy burden for the plaintiffs. And it is, first, that Alpa oversees a process. It set up a process. It set it up by vote of all of their representatives and modified from time to time because different pilot groups have different sizes and different characteristics, not just size. Some are paid more. Some are paid less. Some have more longevity. Some have less. Some have bigger equipment. Some have smaller equipment. Many differences go into airlines which merge, and the seniority process is complicated. So the process was set up to take power out of it and to put it in the hands of the pilots themselves at each airline, and that's what was done in this case. And the law, Congress, in McCaskill-Bond said this is what's supposed to happen. You're supposed to follow your internal union policies. So in this case, each group had their own master executive council that they elected, and that council elected their own merger committee, so they each had their committee. Those committees were the parties to the arbitration. Alpa itself is not a party. It's the committees. They're paid for. They hire their own lawyers. They choose their own lawyers, and those lawyers are paid for by the pilots of those respective groups out of assessments that they impose on themselves for that purpose. Now, the plaintiffs here make no claim that their committee was corrupt or that their committee, the continental pilots who represented them or their council, did anything except an exemplary job of representing their interests. Those committees selected the arbitrators. Alpa did not. Yes, it was a list that Alpa provided, but the parties agreed that Alpa should provide that list. That was their opportunity. The plaintiffs don't allege that the arbitrators had been personally corrupted. They have no claim of that kind. And in this case, the arbitrators had full authority to decide all the procedural and evidentiary questions, to interpret all the merger policy terms crucial to their decisions, to interpret them, fair and equitable, which is the main point, career expectations, longevity, and status and category. All those terms came into the decision. The parties agreed that the arbitrators had the power to interpret those words. Each side had the same ability to offer evidence. Each side had the same ability to hire experts and consultants. They had the same ability to object. And it is not true that the Continental Pilots Committee objected to Captain Harwood's testimony. There was no such objection. They were present for the entire testimony. They knew what he was testifying to. They knew what he was testifying about, and they did not object to that any more than they did to most other aspects of the proceedings. They were fully aware of all the proceedings that counsel complains about, including the proceedings before Arbitrator Javits concerning the W-2 data that went into the arbitration. And they were aware of the defined benefit plan data dispute, and they were aware of everything that happened in the arbitration, meaning the merger committees and their counsel, and all the arguments. And the transcripts and briefs in this proceeding were posted every day on the Internet for all the members from both Continental and United to read and review every day. And when it's over, Captain Pierce, who was the chairman of the Continental Pilots, said to his membership he never received any objection, any complaint from anybody about the proceeding, about the fairness of the proceeding, and that included the merger committee themselves. No complaint to Pierce that the process was flawed or interfered with in any way. Now, the Continental Pilots Committee Was there any policy with regard to the hiring of Harwood? Yes, sir. Could not be hired? Was this contrary to ALPA policy that you had a pilot hired? It was not contrary to ALPA policy. ALPA policy does have a provision that a pilot should not be employed by an MEC. It has another provision, which is in the merger policy, that says that the merger committees have complete autonomy in the matter of integrating the lists and complete autonomy in selecting whoever they want to work for them. They have that power. Now, in this case, as has always been the case, that ALPA never interferes, has never interfered with the choice by any committee of who their counsel are or who their consultants are going to be. And the pilots pay for those out of their own funds. So it was not the policy. And the vice president of administration of the union gave an affidavit saying, yeah, that's what the union did here was correct. Captain Moak, the president, was asked by Mr. Harwood, Captain Harwood from Delta, will there be political problems if I do work for the United Pilots? I've been asked to do work for them because Captain Harwood was a computer expert. He'd done work like this, and he knew how to handle all these seniority integration issues. And Captain Moak checked with Captain Pierce and came back and said, no, there's no political problem. That was not giving him permission because Captain Moak did not have the authority to give him permission, Your Honor. The merger committees themselves had complete autonomy. And for that reason ALPA also represent Delta Pilots? Yes, sir, it does. It represents most of the pilots in the country except currently for a couple of airlines. And let me just talk about that subject for just a minute, because the plaintiffs have had this conjecture that because ALPA does represent a lot of pilot groups and wants to represent pilot groups because that's what the pilots want, to have a strong national union, that therefore ALPA must be biased towards one group or the other. As I said earlier, in every merger there's going to be a larger group and a smaller group, and that's why they set up this policy so as to take those issues off the table. It's one thing to conjecture that because ALPA wouldn't want to lose a pilot group, therefore it would put its thumb on the scales. That's fine. You can conjecture that all you like. But in a case like this with the very high bar, you have to have evidence that that's what the union intended to do here. And the plaintiffs took depositions all over the place and did not come up with one shred of evidence that that is what the union intended to do here, that they had that motive here and tried to bring about a result here. So let's talk about some of the specifics of the process that the plaintiffs talk about. The W-2 data, when Ms. Ginsburg was sent, because W-2 data is confidential information, she was sent to observe the proceedings over whether or not ALPA would be required to seek that data from United Airlines and under what circumstances. She didn't have to say anything. She didn't appear. The arbitrator worked it all out. There is no evidence that Ms. Ginsburg attempted to interfere or influence that. There is speculation on the part of the plaintiffs, but there's no evidence that she did that, and she denied that she did such a thing. And furthermore, and most important of all, the story that I've heard over and over from the plaintiffs that their committee did not have a chance to use this important wage data is simply, I apologize, Your Honor, it is not true. The arbitrator ordered ALPA and ALPA complied with the order to secure from United Airlines individual personal wage data for every United pilot in order to provide that information to the Continental Merger Committee person by person without names, without names to protect their confidentiality, and without their employee numbers to protect their confidentiality. The Continental pilots wanted that data in order to show that Continental pilots, person for person, were paid more for the same kind of flying and even for lesser flying than United pilots, and this was part of their case. They made that case. They made that case and showed in great detail. So they had every opportunity. What happened is that the arbitrators, and this was their job to make this decision, the arbitrators said, well, yes, it's true, and they agreed that that was true, but the United pilots had better work rules and better non-compensation, non-wage compensation, so the arbitrators said, on balance, the compensation and working conditions of both groups were elevated by the rising tide of the new collective bargaining agreement, so they basically said it's a wash, and that was their job to make that decision. It wasn't ALPA's job, and ALPA didn't try to make that for them. So then there was the question of the defined benefit plan data that was used by the United side in order to deal with the question of when a Continental pilot was working for Continental and when he was working for some other subsidiary, which was an important question for about one-fourth of the pilot group because of the question of longevity and how longevity would be applied, and that was up to the arbitrators to make that decision. The defined benefit plan data was not confidential because the question of whether somebody's working for Continental or working someplace else is not confidential. That's public information. But the bottom line on that data, too, was that ALPA didn't interfere with anything. The parties agreed, the two merger committees agreed with each other on how that data should be used and how it should be presented and with what degree of confidentiality. That was not ALPA's decision. That was their decision, the committee's decision. So let me go back now to the question of Captain Harwood because in some ways what they're saying about Captain Harwood goes to the heart of the problem with their case, and that is that they, as we've said earlier, they have to show that the award was somehow erroneous in order to get review at all, and they did not show that in the district court, and they haven't shown it any differently here because their position on that is that, as counsel put it, the arbitration panel gave too much credit to the longevity of the United Pilots and not enough to other factors for the Continental Pilots. That was their job, to make that decision. What Captain Harwood did was simply to show them one way to count longevity. They, the panel, decided to use longevity under ALPA's merger policy and the standards that ALPA had adopted. Longevity, I mean, after all, length of service, seniority, it's not unusual to go together, so that that was an important part of their decision. Not as much as the United Pilots wanted. The Continental Pilots did better under that prong of the outcome than the United Pilots wanted them to, so it was not an unbalanced decision. But from the standpoint of causation and erroneous outcome, plaintiffs are saying that if Harwood, and they say this in their reply brief, if Harwood hadn't testified, the award would have been different. They don't say in what way it would have been different, would it have been better for them or worse for them. But if there is a way, and this is critical, to count longevity that was more favorable to the Continental Pilots than what the United Committee put in, the Continental Merger Committee did not present it. They presented no method for counting longevity, and plaintiffs have presented no such method as to how it would have come out differently or better for them if Harwood hadn't testified. So, sir. We're not here on fairness. We're here on bad faith. Yes. And so what Harwood did, other than to show the possibility of bad faith, doesn't matter whether he's right or wrong. That's correct, Your Honor. But in addition to the bad faith, Your Honor, the plaintiffs have to show that the bad faith produced an erroneous outcome for them and undermined the integrity of the process with an erroneous outcome. And they have shown nothing about what Mr. Harwood did that they would have done any different. Well, but if they show that he was buddy-buddy and chums with the United people that were involved, then doesn't that make his computer expertise come under question? No, Your Honor, because his computer expertise, he was cross-examined. Everything that he did was on the record. The plaintiffs, the Merger Committee for Continental Pilots Council had full opportunity to cross-examine him, to go into all of that. There were some e-mails from him after the hearings were over in which, not surprisingly, he showed that he was internally among them rooting for the side that had hired him. I mean, that's not a surprising thing in an expert or a consultant. But in no way did that impugn the integrity of what he said or did. And all that he did was to show a method, a very simple method, by which you could use longevity in putting together these two seniority lists. The problem that the arbitrators faced with respect to longevity is exactly the one that the Continental Pilots themselves described after the hearing, which is that there were variations in the longevity among the Continental Pilots between seniority and longevity because they were the product of several other mergers coming together at Continental Airlines over many years. And the result of those mergers is you had a disparity between people's place on the list and their length of service. That had to be smoothed out. So the Continental Merger Committee themselves said that Harwood's method was used by the arbitrators as a way to smooth out the erratic longevity values that occurred down our seniority list. So that's all that that did. It just set up a way of doing that. And the arbitrators said that was a sound way to do it, and that's all that went on. Now, the United Merger Committee, through other witnesses, said that we want to give half the value in this case to the longevity and half the value in this case to status and category, meaning I'm a captain on a 737 or I'm a first officer on a 777. And the arbitrators said, no, that's not fair to the Continental Pilots. We are going to give less weight to longevity and more weight to status and category. And that improved the position of the Continental Pilots compared to what the United Pilots had wanted them to do. Now, I've already mentioned that ALPA's – let me just say one other thing about the evidence with respect to Captain Harwood. ALPA did not pay him for that testimony. He was paid by the Merger Committee out of merger funds. All of the checks that were produced in this case – and plaintiffs never said that we didn't produce everything – all the checks that were produced in this case with respect to that testimony came out of the merger fund. The 1099s to Captain Harwood were written on behalf of the merger fund. There was one piece of evidence that said – an LM-2, which is a federal form that unions file – that said that ALPA had paid that money, this $19,000 that went to Captain Harwood in one year. That happened to be that $19,000, the same amount that he was paid by the merger fund. That LM-2 was a mistake. ALPA put in the testimony that that was a mistake. That was inconsistent with the checks and the 1099s. So there really is no evidence that ALPA paid him anything for that testimony. Now, there are LM-2s that show that ALPA paid Captain Harwood flight pay loss for time that he spent as a Delta pilot working at the Delta MEC. That's something that's pretty routine. This case is an arbitration case. That's right. Why isn't the regular standard of review, which is very limited both to the district court and us, why doesn't that apply? The limited standard of review does apply, Your Honor, and there's an extremely high bar to setting aside an arbitration award. It is also the case that in a union case like this, if the plaintiffs can show that the union's bad faith conduct interfered with the integrity or substantially undermined the integrity of the process, that's a basis for review. It's not the same as in every other case. But it would be true, I'm sure, in any arbitration case, that if one party could show that the other party had interfered, then that would be the improperly bribed witness. That would be the basis for setting it aside. So it's extremely limited, and it's highly limited in this case. Thank you, Your Honors. Back to you, Mr. Dolich. One of the things I wanted to point out to the court since we're looking at bad faith, Dan Katz, who was the attorney for the Continental group, complained to Bruce York, who's a senior officer at ALPA National, that, and I'll just read you the quote, siding with the United guys. And then York got very angry. He said, Katz is out of control. This is all in email evidence. York observed really not helping himself because ALPA has funded a pretty nice lifestyle for him. And one of the things I want to make sure the court understands, if you look at who does all this work, there's like a handful of lawyers and a handful of arbitrators that do all this. And everybody knows each other, and sometimes they're representing one side and they're representing another. So it's a fairly big deal when somebody like Dan Katz, who has made a very nice living off of doing these for different ALPA carriers at different times throughout his career, is going back to ALPA and complaining, you are steering this towards the United guys. And so I think that's another piece of evidence of bad faith I didn't get a chance to get to earlier. And I think it addresses some of the things that Mr. Abrams was talking about. The other thing, York, who's a very senior ALPA official, in his deposition he said ALPA's stated goal is to be the only union for airline pilots in the United States. So there is some institutional bias. And again, when you're getting into bad faith and subjectivity, those are things that need to be explored and examined and sometimes can only be assessed by the trier of fact, either a jury or if it's a bench child, the judge. One thing I'd also like to mention, again, what I said earlier was Pierce, J. Pierce, Chairman of the Continental MEC, testified that he called up Lee Moak and he complained to him also in writing once he found out what Harwood was there for. So there was a complaint. Now, what happened at the arbitration and exactly what was done there were not completely involved. Remember, my clients are outside guys whose seniority has been affected by what these other people were all doing. And then one other thing I think is very important for the court to understand, he talked about longevity, which is a key issue in airline mergers. The Zeus database that Continental Airlines kept was admittedly by, I think all the witnesses agree, was a mess. They couldn't figure out when guys were really hired. They had some guys senior to guys that they were clearly not senior to. Which bunch was that? That's the Continental guys. So that was another reason why they were trying to get away from using some of these more traditional methods and some of these discovery issues were so important because it created errors. And the Continental pilots complained and objected that they weren't getting all the evidence they needed. Pierce testified that he called Moak up and complained about that, Lee Moak being, again, ALPA National President, while this was happening in real time. So we may have things happening in the arbitration that were on the record, but we also have, on a national level, the MEC chairman calling the president of ALPA National and complaining about some of the conduct and things that were going on. You're also . . . Can we look at the arbitration panel's decision and see in there how this action by ALPA affected the decision of the arbitration panel? I wouldn't say you can by just looking at it. I think what it's going to take, if we can get back in front of the judge, is getting some experts to go in and pull that apart a little bit, and we did not do that at this point. Candidly, sometimes when you find yourself with dismissal motions and then somewhat limited discovery, you sometimes don't know where the court needs you to go to figure certain things out, and that's one of the things of our current federal practice. It's hard on us as plaintiff's lawyers sometimes. I'm not asking for any slack for that, but it is a reality here, and that would be something we would definitely address if we got back to trial. The other thing I want to talk about is there is a factual dispute on the ALPA policy. He's saying it's okay that they hired Harwood. We're saying it's not. If you look at the documents that are in the record, it's not. If you look at what they did, they kind of came up with this contorted declaration that says, well, it's okay he did it under these circumstances because the merger committee paid him, not ALPA National. Well, it's a disputed fact whether ALPA National paid him, number one. Harwood's testimony, his own testimony, puts that into dispute. But more importantly, the courts have held, including this court, that when it comes to a union's interpretation of its own rules, you don't give it deference when they're changing it and there's an allegation of bad faith. In fact, I think this court in the O'Neill case, O'Neill v. ALPA, that ultimately went up to Supreme Court, used the reverse of that rule and applied what was a previous circuit court's holding that you don't let them get to interpret their own rules when they're interpreting them, in effect, in their favor, to say we didn't really do anything wrong here. All right. Thank you. Thank you, Mr. Dowers. Ms. Dave.